IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELISSA DENT

v.  :  Civil Action No. DKC 08-0886

MONTGOMERY COUNTY POLICE
DEPARTMENT, et al.  :

**MEMORANDUM OPINION**

Presently pending and reading for review in this civil rights case are: (1) a motion for summary judgment filed by Defendants Montgomery County Police Department, et al. (Paper 35) and (2) a motion to modify the scheduling order and extend time to respond to Defendants' motion for summary judgment (Paper 39). The issues have been fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendants' motion for summary judgment will be granted in part and denied in part and Plaintiff's motion to modify the scheduling order will be denied.

**I.  Background**

**A.  Facts**

The following facts are undisputed. As of October 2006, when the events relevant to this case occurred, Plaintiff Melissa Dent was a resident of Gaithersburg, Maryland.

Defendants are the Montgomery County Police Department, Officer Adam Siegelbaum, Officer Kimberly Wilson, Officer John Mullaney, and Officer Jennifer Phoenix.

On October 7, 2006, Officers Siegelbaum, Wilson, Mullaney, and Phoenix (the "Officers") were dispatched to Plaintiff's home after Plaintiff's friend, Sabrina Gorham, called 911 for emergency assistance. (Paper 35, Ex. 1, Nos. 4, 7; Paper 43, Ex. A ¶ 16; Paper 43, Ex. B ¶ 6). Ms. Gorham told the 911 dispatcher that Plaintiff had taken some pills and asked for an ambulance. (*Id.*). Officer Siegelbaum arrived at Plaintiff's house first. (Paper 35, Ex. 1, No. 7; Paper 43, Ex. A ¶ 17; Paper 43, Ex. B ¶ 9). Plaintiff, Ms. Gorham, and her husband Sean Gorham were inside Plaintiff's home. Officer Siegelbaum questioned Plaintiff about whether she was attempting to commit suicide and how many pills she took. (Paper 35, Ex. 1, No. 7; Paper 43, Ex. A ¶¶ 18-24; Paper 43, Ex. B ¶ 10-11, 17). Officer Siegelbaum told Plaintiff that she was going to be taken to the hospital. (Paper 35, Ex. 2, No. 4; Paper 43, Ex. A ¶ 26). Plaintiff refused to be taken to the hospital. (Paper 35, Ex. 1, No. 4; Paper 35, Ex. 3, No. 4; Paper 43, Ex. A ¶ 26). While this exchange took place, Officers Mullaney and Phoenix arrived, followed by Officer Wilson. (Paper 43, Ex. A ¶¶ 29-30; Paper 43, Ex. B ¶¶ 15). These Officers also asked Plaintiff and

her friends questions about whether Plaintiff was attempting to commit suicide and how many pills she took. (Paper 35, Ex. 1, No. 4; Paper 35, Ex. 2, No. 4; Paper 43, Ex. A ¶¶ 29-30; Paper 43, Ex. B ¶¶ 15).

Nearly all of the remaining facts are in dispute.

The Officers report the following facts: The Officers were dispatched to Plaintiff's house for a "suicide in progress." (Paper 35, Ex. 1, No. 4, 7). The Officers observed beer and pill bottles lying around the home. (*Id.*). When the Officers arrived, they observed that Plaintiff had red, watery, bloodshot eyes and spoke in slurred speech. (Paper 35, Ex. 5, at 28). The Officers asked Plaintiff how many pills she had taken and she gave varying responses to the question, eventually responding that she had taken the "whole fucking bottle." (Paper 35, Ex. 1, No. 4). The Officers pleaded with Plaintiff for her to go with them for an emergency evaluation petition at the Shady Grove Adventist Hospital. (Paper 35, Ex. 1, Nos. 4, 7; Ex. 2; Ex. 3, No. 4; Ex. 4). Plaintiff refused to go with the Officers. Plaintiff became violent, combative, and agitated. (Paper 35, Ex. 1, Nos. 4, 7, 22; Ex. 2, Nos. 4, 22). The Officers were concerned about Plaintiff's health and safety and thought she had ingested drugs and alcohol. (Paper 35, Ex.

1, No. 7). The Officers thought that an overdose effect might occur. (*Id.*).

The Officers told Plaintiff that they needed to handcuff her and take her to the hospital. (Paper 35, Ex. 2, No. 4). Plaintiff swung her lit cigarette at Officer Siegelbaum. (Paper 35, Ex. 1, No. 7). Officer Mullaney tried to grab Plaintiff's left arm for handcuffing, and Plaintiff actively resisted, kicked, and tried to bite the Officers. (Paper 35, Ex. 1, No. 7; Ex. 2, No. 4). The Officers instructed Plaintiff to stop resisting, calm down, and give them her hands. (Paper 35, Ex. 1, No. 7; Ex. 2, No. 4; Ex. 3, No. 4). Plaintiff responded with more physical resistance. (Paper 35, Ex. 1, No. 4; Ex. 2, No. 4; Ex. 3, No. 4; Ex. 4, No. 4). The Officers warned Plaintiff that she needed to cooperate or she would be Tased. (Paper 35, Ex. 3, No. 4). Officer Mullaney attempted to handcuff Plaintiff's left arm, Officer Siegelbaum attempted to handcuff her right arm, and Officer Wilson attempted to control Plaintiff's kicking legs. (Paper 35, Ex. 1, No. 7; Ex. 2, No. 4; Ex. 3, No. 4). Plaintiff kicked Officer Wilson in the inner thigh and bit Officer Siegelbaum. (Paper 35, Ex. 3, No. 4; Ex. 1, No. 16). Officer Wilson radioed for further backup. (Paper 35, Ex. 3, No. 4). Officer Siegelbaum and

Officer Wilson Tased Plaintiff so that they could handcuff her. (Paper 35, Ex. 1, No. 4; Ex. 3, No. 4; Ex. 4, No. 4).

Emergency fire and rescue personnel were on the scene, but it was decided that Plaintiff would be transported to the hospital in the police cage car because of Plaintiff's violent behavior. (Paper 35, Ex. 2, No. 8; Ex. 3, No. 8). The Officers asked the fire and rescue personnel what symptoms of overdose they should watch for during transport and were warned about possible complaints of chest pain. (Paper 35, Ex. 2, No. 8). In route to the hospital, Plaintiff complained of chest pains. (Paper 35, Ex. 1, No. 8; Ex. 2, No. 8). Officer Siegelbaum pulled the car over at a fire station so Plaintiff could be transferred into an ambulance for the rest of the ride to the hospital. (Paper 35, Ex. 1, No. 18; Ex. 2, No. 18). Officer Mullaney rode with Plaintiff in the ambulance. (Paper 35, Ex. 1, No. 8; Ex. 2, No. 8). Officer Phoenix prepared an emergency evaluation petition and Plaintiff was evaluated at Shady Grove Adventist Hospital. (Paper 35, Ex. 8). Plaintiff's blood alcohol level was .284. (Paper 35, Ex. 9, at 7). Plaintiff was transferred to Potomac Ridge Behavioral Health, where she was admitted for three days. (Paper 35, Ex. 10).

Plaintiff's version of the facts is strikingly different. Plaintiff reports the following facts: On October 7, 2006,

Plaintiff drank approximately four beers during the day in the company of two of her neighbors. (Paper 43, Ex. A ¶ 3, 4; Ex. C ¶ 3). That day, Plaintiff's children were at Ms. Gorham's home. (Paper 43, Ex. A ¶ 4; Ex. B ¶ 1). Plaintiff decided to go to bed early, and took one or two sleeping pills. (Paper 43, Ex. A ¶¶ 6-7). Before Plaintiff went to sleep, she called Ms. Gorham to make sure that everything was set for Plaintiff's children to stay overnight at the Gorhams' home. (Paper 43, Ex. A ¶ 9; Ex. B ¶ 2). Plaintiff told Ms. Gorham to tell Plaintiff's children that she said goodnight and that she loved them. (Paper 43, Ex. A at ¶ 11; Ex. B ¶¶ 2-3). Ms. Gorham expressed that Plaintiff sounded loopy or drowsy. (Paper 43, Ex. A ¶ 10; Ex. B ¶ 3). Plaintiff indicated that she was fine and that her sleeping pills made her drowsy. (Paper 43, Ex. A ¶ 10).

Shortly thereafter, Ms. and Mr. Gorham decided to check on Plaintiff to make sure that she was okay, so they let themselves into her house with a key. (Paper 43, Ex. A ¶ 13; Ex. B ¶ 4). Plaintiff was in her room, and Ms. Gorham asked Plaintiff to come downstairs and sit on the couch; she did so and began to smoke cigarettes. (Paper 43, Ex. A ¶ 14; Ex. B ¶ 5). There were no beer or pill bottles lying around the home. (Paper 43, Ex. A ¶ 37; Ex. B ¶¶ 12-13). Ms. Gorham called 911 and asked for an ambulance. (Paper 43, Ex. A ¶ 16; Ex. B ¶ 6). Ms.

Gorham told the dispatcher that Plaintiff sounded a bit loopy and that she had taken a couple of pills. (*Id.*). Ms. Gorham told the dispatcher that Plaintiff was not suicidal. (Paper 43, Ex. B ¶ 7). Ms. Gorham reported that Plaintiff seemed alert. (*Id.*). The 911 dispatcher said that an ambulance would be sent to Plaintiff's house. (*Id.*).

About ten minutes later, Officer Siegelbaum arrived. (Paper 43, Ex. A ¶ 17; Ex. B ¶ 9). Officer Siegelbaum repeatedly questioned Plaintiff and Ms. Gorham and accused Plaintiff of attempting suicide. (Paper 43, Ex. A ¶¶ 18-24; Ex. B ¶¶ 10-11, 17). Plaintiff told Officer Siegelbaum that she had taken one or two pills. (*Id.*). Officer Siegelbaum told Plaintiff that she would be taken to the hospital. (Paper 43, Ex. A ¶ 26). Plaintiff did not want to go to the hospital in the custody of a police officer. (*Id.*). Officer Siegelbaum continued to tell Plaintiff that she had attempted suicide and question her about the number of pills she took. (Paper 43, Ex. A ¶¶ 18-24; Ex. B ¶¶ 10-11, 17-18).

The other Officers arrived and questioned Plaintiff in an aggressive and hostile manner. (Paper 43, Ex. A ¶¶ 29-30; Ex. B ¶ 15). The emergency medical personnel waited outside of Plaintiff's home but were not permitted to enter. (Paper 43, Ex. A ¶ 28; Ex. C ¶¶ 7-9). No Officer asked Plaintiff if she

would be willing to be seen by a paramedic or other emergency medical professional. (Paper 43, Ex. A ¶ 28). Officer Siegelbaum asked Ms. Gorham to retrieve the pill bottle for her sleeping pills, which she did. (Paper 43, Ex. A ¶ 37; Ex. B ¶ 14). Officer Siegelbaum called Poison Control, and the other Officers continued to question Plaintiff. (Paper 43, Ex. A ¶ 38). Plaintiff did not become aggressive with the Officers or verbally or physically threaten them. (Paper 43, Ex. A ¶¶ 27, 32-34; Ex. B at ¶¶ 18-22). When asked how many pills she took, Plaintiff did state, "Fuck it! I took one or two!" but did not say that she took "the whole fucking bottle." (Paper 43, Ex. A ¶¶ 35-36; Ex. B ¶¶ 11, 16). Plaintiff told the officers that she was not going anywhere and instructed them to get out of her house. (Paper 43, Ex. A ¶¶ 39-40).

Plaintiff reports that Officers Siegelbaum and Mullaney picked or dragged her up off the couch and slammed her face down on the floor. (Paper 43, Ex. A ¶¶ 40, 43-44; Ex. B ¶ 22). Officer Mullaney drove his knee into Plaintiff's back and grabbed her left arm and twisted it behind her back, and told her that he would break her other arm if she did not give it to her. (Paper 43, Ex. A ¶¶ 44-45; Ex. B ¶¶ 23-24). Officer Siegelbaum drove his knee into Plaintiff's and into her eye, causing it to become severely black and blue and swell shut.

(Paper 43, Ex. A ¶¶ 46, 53; Ex. B ¶ 23; Ex. E). Officers Siegelbaum and Wilson proceeded to Tase Plaintiff several times on her back. (Paper 43, Ex. A ¶¶ 47-48; Ex. B ¶¶ 22-24). Plaintiff had twelve Taser burn wounds on her back. (Paper 43, Ex. F). Ms. Gorham pleaded with the officers to stop, and Officer Phoenix threatened to Tase Ms. Gorham. (Paper 43, Ex. A ¶ 50; Ex. B ¶ 25). Plaintiff had trouble breathing. (Paper 43, Ex. A ¶ 54).

Officer Siegelbaum led Plaintiff out of her home in handcuffs. (Paper 43, Ex. A ¶ 55; Ex. B ¶ 26; Ex. C ¶ 10). Plaintiff asked if she would be taken to the hospital, and Officer Siegelbaum responded that she would after he finished his paperwork. (Paper 43, Ex. A ¶ 56). Officer Siegelbaum placed Plaintiff in his patrol car, later stopped and placed her on a curb, and finally placed her in an ambulance that took her to the hospital. (Paper 43, Ex. A ¶ 57; Ex. C ¶ 10).

**B.   Procedural History**

On April 14, 2008, Plaintiff filed a complaint in this court, which alleged deprivation of her civil rights and gross negligence against certain police officers and Montgomery County. (Paper 1). Plaintiff filed an amended complaint and later, on July 23, 2008, a second amended complaint. (Papers 8 and 14). Discovery ended on August 7, 2009. On September 8,

2009, Defendants filed a motion for summary judgment. (Paper 35). On October 15, 2009, Plaintiff filed a motion to modify the scheduling order and extend time to respond to Defendants' motion for summary judgment. (Paper 39).

## II. **Summary Judgment**

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exists factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007); *Emmett,* 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support

10

each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.* Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. (citations omitted).

## III. Analysis

### A. Fourth Amendment Claims

Plaintiff's second amended complaint alleges that the Officers violated Plaintiff's Fourth Amendment rights by using excessive force against her and by forcing her go to the hospital for an emergency evaluation. Defendants argue that the Officers had probable cause to transport Plaintiff to the

hospital for her own safety and that none of the officers used excessive force against her.

Defendants liken this case to three cases considered by the United States Court of Appeals for the Fourth Circuit that address detentions for emergency evaluation. *See S.P. v. City of Takoma Park*, 134 F.3d 260 (4th Cir. 1998); *Gooden v. Howard Cnty., Md.*, 954 F.2d 960 (4th Cir. 1992); *Vanderwaart v. Baltimore Cnty., Md.*, 836 F.2d 548 (Table), No. 87-2067, 1987 WL 30227, *1 (4th Cir. 1987). Defendants note that it was reported to the Officers that Plaintiff had attempted to take her own life and the Officers saw empty beer and drug bottles in her home; as such, they thought she had the wherewithal to commit suicide. Defendants assert that "[b]ased on their training, investigation and observations, the officers reasonably believed Plaintiff had a mental disorder, and that there was a clear and imminent danger of her doing bodily harm to herself." (Paper 35, Attach. 1, at 13). Defendants also argue that they are entitled to immunity for their actions under Md. Code Ann., Cts. & Jud. Proc. § 5-623.

Additionally, Defendants argue that the force used by the Officers was reasonable. Defendants assert that (1) Officer Phoenix had no hands-on contact with Plaintiff, (2) Officer Mullaney's physical contact with Plaintiff was limited to him

12

grabbing her left arm and attempting to handcuff her, (3) Officer Siegelbaum's physical contact with Plaintiff was limited to grabbing her arm, placing her on the floor, and using a Taser on Plaintiff so that he could handcuff her, and (4) Officer Wilson's physical contact was limited to attempting to control Plaintiff's legs when she was on the floor and using a Taser on Plaintiff. (*Id.* at 15-19).

Plaintiff counters that Defendants did not have probable cause to detain her for an emergency evaluation and that the force used against her was excessive. Plaintiff argues that, after talking with her and her friends, the Officers had no reason to believe that she had a mental disorder or that she was a danger to herself or others. (Paper 43, Attach. 1, at 11). Plaintiff also contends that Defendants are not entitled to immunity for detaining her under Maryland law because they did not act "in good faith and with reasonable grounds." (*Id.* at 12). Plaintiff asserts that the cases that Defendants cite are inapposite because the plaintiffs in those cases had exhibited seriously psychotic or violent behaviour. Plaintiff instead likens this case to *Bailey v. Kennedy*, 349 F.3d 731 (4th Cir. 2003), in which the Fourth Circuit found that officers did not have probable cause to detain the plaintiff for a psychiatric violation even though they had been informed that

the plaintiff was suicidal. *Id.* at 740-41. Additionally, Plaintiff argues that the Officers used excessive force against her because (1) Officer Phoenix did not protest or attempt to stop the other Officers and threatened to Tase Ms. Gorham; (2) Officer Mullaney threw Plaintiff on the ground, kneed her, and assisted the other Officers in Tasing her; (3) Officer Siegelbaum dragged Plaintiff off of her couch, slammed her on the floor, kneed her in the back and eye, twisted her arms, and Tased her no less than six times; and (4) Officer Wilson bound Plaintiff and Tased her no less than six times. Plaintiff argues that summary judgment should be denied because of genuine disputes of material fact.

To prevail on a claim pursuant to Section 1983, a plaintiff must show that (1) the defendant deprived her of a right secured by the Constitution or the laws of the United States and (2) and the deprivation was achieved by the defendants acting under color of state law. *Paul v. Davis*, 424 U.S. 693, 696-97 (1976). There is no dispute that the police officers' actions constituted state action.

The first issue is whether Plaintiff's Fourth Amendment rights were violated when the officers made Plaintiff the subject of a petition for an emergency evaluation. The Maryland Health – General Code provides:

14

> (a) A petition for emergency evaluation of
> an individual may be made under this section
> only if the petitioner has reason to believe
> that the individual:
>
> (1) Has a mental disorder; and
>
> (2) The individual presents a danger to the
> life or safety of the individual or of
> others.

Md. Code Ann., Health-Gen § 10-622. Furthermore, Md. Code Ann.,

Cts. & Jud. Proc. § 5-624 provides:

> (b) Any petitioner who, in good faith and
> with reasonable grounds, submits or
> completes a petition under Title 10,
> Subtitle 6, Part IV of the Health-General
> Article is not civilly or criminally liable
> for submitting or completing the petition.
>
> (c) Any peace officer who, in good faith and
> with reasonable grounds, acts as a custodian
> of an emergency evaluee is not civilly or
> criminally liable for acting as a custodian.

Section 5-623 (b) also provides that "A person who in good faith

and with reasonable grounds applies for involuntary admission of

an individual is not civilly or criminally liable for making the

application under Title 10, Subtitle 6, Part III of the Health-

General Article."

To seize an individual for an emergency medical evaluation,

"an officer must have probable cause to believe that the

individual posed a danger to herself or others before

involuntarily detaining the individual." *See S.P.*, 134 F.3d at

266.

In *Bailey*, 349 F.3d at 739, the Fourth Circuit explained:

> Probable cause is a "practical, nontechnical conception" that addresses the "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1993)(quotation marks omitted). It is a "fluid concept" that cannot be "reduced to a neat set of legal rules." *Id*. at 232, 103 S.Ct. 2317. We have previously held that in the case of the law governing seizures for psychological evaluations, there is a "lack of clarity" as far as what constitutes probable cause. *Gooden* [], 954 F.2d [][at] 968 [].

Viewing the facts in the light most favorable to Plaintiff, it cannot be determined as a matter of law that the officers had probable cause to seize Plaintiff for an emergency medical evaluation. Although Defendants assert that they were dispatched for a "suicide in progress," Plaintiff presented evidence that Defendants were informed multiple times that Plaintiff was not suicidal. Ms. Gorham reported that she told the 911 dispatcher that Plaintiff was not suicidal. When the officers arrived at Plaintiff's house, Plaintiff was sitting calmly on her couch. Plaintiff asserts that she told each of the officers that she had not attempted suicide and was not attempting to commit suicide. Plaintiff also contends that she told the officers that she had only taken one or two sleeping pills. Plaintiff, Ms. Gorham, and Plaintiff's neighbor

16

Christine Nitterhouse testified that pills and beer bottles were not strewn about Plaintiff's house. Defendants' version of the facts, of course, contradicts Plaintiff's account and calls into question whether Plaintiff was acting violently during their interaction with her. Defendants particularly rely on the fact that the 911 call was coded as a "suicide in progress." However, as in *Bailey*, "[w]ithout more, the 911 report cannot bear the weight that the officers would place on it. The law does not permit 'random or baseless detention of citizens for psychological evaluations.'" *Bailey*, 349 F.3d at 740 (quoting *Gooden*, 954 F.2d at 968). There are genuine issues of material fact as to whether Defendants had probable cause for detaining Plaintiff for an emergency medical evaluation and, in regard to the state law immunity defenses, as to whether Defendants acted "in good faith and with reasonable grounds" to petition for an emergency evaluation or involuntarily admit Plaintiff to the hospital. Therefore, summary judgment will be denied on Plaintiff's Fourth Amendment claim that she was involuntarily detained and forced to go to the hospital for an emergency evaluation.

The second issue is whether, even assuming there was probable cause to detain Plaintiff, the officers used excessive force against Plaintiff. The Supreme Court of the United States

has clarified that courts must use a standard of "objective reasonableness" to determine whether force used by police officers was excessive in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. *Id.* at 395. "A reviewing court must make 'allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving.'" *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001), *cert. denied*, 534 U.S. 949 (2001)(quoting *Graham*, 390 U.S. at 397). "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Anderson*, 247 F.3d at 130 (quoting *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996)(citations omitted)).

There is a genuine dispute of material fact as to whether the force the officers used against Plaintiff was excessive. Plaintiff testified that she was not aggressive toward the officers and that she asked them to leave her home. Plaintiff recalls that the officers picked or dragged her off her couch

and threw her to the floor, kneeing her in the back and eye before they used their Tasers on her at least six times.

On the other hand, the officers recount that Plaintiff acted with increasing levels of agitation and violence. Specifically, the officers testified that Plaintiff kicked Officer Wilson in the inner thigh and bit Officer Siegelbaum. The officers report that they warned Plaintiff that they would have to use their Tasers on her if she would not submit to being handcuffed and taken to the hospital.

The only officer who had no hands-on contact with Plaintiff was Officer Phoenix. Plaintiff asserts that Officer Phoenix threatened to Tase her friends, but the Gorhams are not parties to this suit. Because Plaintiff has not presented evidence that Officer Phoenix used force against her, Officer Phoenix entitled to judgment as a matter of law that he did not violate Plaintiff's Fourth Amendment rights by using excessive force against her. The remaining defendants, however, are not entitled to summary judgment as to Plaintiff's excessive force Fourth Amendment claim because there are genuine issues of material fact as to whether their actions were reasonable.

**B.  Fourteenth Amendment Claims**

Plaintiff's complaint alleged that Defendants violated her Fourteenth Amendment rights when they displayed deliberate

19

indifference to her medical needs and, according to her opposition brief, when the officers "attempted to rob Plaintiff of her liberty without legal justification . . . and attempted to handcuff Plaintiff and drag her out of her home at night . . . ." (Paper 1 ¶¶ 22, 42, 62, and 82; Paper 43, Attach. 1, at 24).

Defendants assert that Plaintiff was not deprived of any Fourteenth Amendment right because the officers did not display deliberate indifference to her medical needs. (Paper 35, Attach. 1, at 19). Plaintiff contends that her Fourteenth Amendment claims are not limited to the officers' deliberate indifference to her medical needs, but also include the officers' deprivation of her liberty without legal justification. (Paper 43, Attach. 1, at 24).

The Fourteenth Amendment provides that no state "shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. The due process clause of the Fourteenth Amendment "guarantees more than fair process" and "includes a substantive component that provides heightened protection against government interference with certain fundamental rights." *Martin v. St. Mary's Dep't of Social Servs.*, 346 F.3d 502, 511 (4th Cir. 2003). The core of substantive due process is to protect the individual against

"arbitrary action of government."  *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).

"Only governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." *Young v. City of Mount Rainer*, 238 F.3d 567, 574 (2001)(quoting *County of Sacramento*, 523 U.S. at 846).  "[C]onduct that amounts to 'deliberate indifference' [] is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim."  *Young*, 238 F.3d at 575 (citations omitted).  "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."  *Id.* at 575-76 (citations omitted).

Plaintiff asserts that, after she was handcuffed, Officer Siegelbaum led her out of her home.  Plaintiff asked if she would be taken to the hospital, and Officer Siegelbaum responded that she would after he finished his paperwork.  Plaintiff has not presented evidence of how long she had to wait to be transported.  Officer Siegelbaum placed Plaintiff in his patrol car, later stopped at a fire station when she complained of chest pain, and finally placed her in an ambulance that took her to the hospital.  Plaintiff has not presented evidence that

Defendants actually knew of and disregarded a substantial risk of serious injury to her or that they actually knew of and ignored her serious need for medical care. Therefore, Plaintiff has not presented sufficient evidence regarding deliberate indifference for a jury to return a verdict in her favor.

Additionally, as the Supreme Court explained in *Graham v. Connor*, 490 U.S. 386, 395 (1989), there is no separate due process claim for excessive force claims:

> Today we make explicit what was implicit in *Garner's* analysis, and hold that all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

All of Plaintiff's claims regarding the deprivation of her liberty due to the officers' actions of handcuffing her and taking her out of her home must be analyzed under the Fourth Amendment.

Therefore, summary judgment will be granted in favor of Defendants on Plaintiff's Fourteenth Amendment claims because she has not presented sufficient evidence for her deliberate

indifference claim and her excessive force claims will be evaluated under the Fourth Amendment.

### C.  Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity is 'an *immunity from suit*, rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007)(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)(emphasis in original)).

The Supreme Court of the United States recently revised the procedure for determining whether a defendant is entitled to qualified immunity. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). Courts are no longer required to consider a rigid two prong analysis "in proper sequence," as directed in *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Instead, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

23

hand." *Id.* at 818. The first prong considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id.*

The United States Court of Appeals for the Fourth Circuit set out the proper way to evaluate the separate Saucier issues:

> The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003). The plaintiff bears the burden of proof on the first question – i.e., whether a constitutional violation occurred. *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993)("Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of showing that the defendant's alleged conduct violated the law"); *see also Crawford-El v. Britton*, 523 U.S. 574, 589, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)(noting that the Court's qualified immunity holding in *Harlow* "related only to the scope of an affirmative defense" and did not change "the plaintiff's burden of proving a constitutional violation"); *Carr v. Deeds*, 453 F.3d 593, 608 (4th Cir. 2006)(affirming summary judgment in qualified immunity appeal "because the plaintiff failed to bring forth admissible evidence from which the jury could conclude" that the officer used

excessive force); *Figg v. Schroeder*, 312 F.3d 625, 642 (4th Cir. 2002)(noting that a § 1983 plaintiff "must prove the illegality of the seizure"). The defendant bears the burden of proof on the second question - i.e., entitlement to qualified immunity. *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003)("The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official."); *see also Bailey []*, 349 F.3d [][at] 739 [](same); *Tanner v. Hardy*, 764 F.2d 1024, 1027 (4th Cir. 1985)("It is a well established principle that qualified immunity . . . is a matter on which the burden of proof is allocated to the defendants."); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981)("the good faith immunity of individual police officers is an affirmative defense to be proved by the defendant"); *cf. Dennis v. Sparks*, 449 U.S. 24, 29, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980)(noting that in a § 1983 action "the burden is on the official claiming immunity to demonstrate his entitlement"); *but cf. Harlow*, 457 U.S. at 815 n. 24, 102 S.Ct. 2727, 73 L.Ed.2d 396 (explaining that the Court had not decided which party bears the burden of proof).

*Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007)(footnotes omitted).

In considering the second prong of the *Saucier* framework, the key issue is whether the law at the time the events in question occurred "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006). "[T]he contours of the right must be sufficiently clear that a

25

reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999). If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability.

Plaintiff has met her burden for showing that the officers' conduct violated her Fourth Amendment rights, both as to her right to be free of excessive force and to not be seized for an emergency medical evaluation without probable cause. Defendants have not met their burden of proof to demonstrate they are entitled to qualified immunity. First, the law is clearly established that individuals have a right to be free from excessive force during the course of a seizure, *Turmon v. Jordan*, 405 F.3d 202, 206 (4th Cir. 2005)(finding the "general right to be free from unreasonable seizures is as old as the Fourth Amendment"). It is equally well established that police may not use a Taser on a compliant adult. Second, Defendants have failed to demonstrate as a matter of law that Plaintiff's

right to be free from seizure for an emergency medical evaluation absent probable cause was *not* clearly established at the time of the incident. Defendants do not explain why the right is not clearly established after the Fourth Circuit's opinion in *Bailey*, 349 F.3d at 731, decided in 2003. Therefore, summary judgment will be denied as to Defendants' qualified immunity claim.

**D. Maryland State Law Claims**

**1. Articles 24 and 26 of the Maryland Declaration of Rights**

Article 24 of the Maryland Declaration of Rights protects substantive due process rights and Article 26 protects the right to be free from unreasonable searches and seizures. The provisions are construed *in pari materia* with the Fourteenth and Fourth Amendments of the United States Constitution, respectively. *See Canaj, Inc. v. Baker & Div. Phase III*, 391 Md. 374, 424 (2006); *see also Carter v. State*, 367 Md. 447, 458 (2002); *State v. Smith*, 305 Md. 489, 513-514 (1986), *cert. denied*, 476 U.S. 1186 (1986). Summary judgment will be granted in favor of Defendants as to Plaintiff's Fourteenth Amendment claims so summary judgment will also be granted on Plaintiff's due process claims under Article 24.

Article 26 of the Maryland Declaration of Rights protects the right to be free from unreasonable searches and seizures.[1] Maryland courts "have long recognized that Article 26 is *in pari materia* with the Fourth Amendment," *Richardson v. McGriff*, 361 Md. 437, 452-53, 762 A.2d 48, 56 (2000)(internal citations omitted). As such, the disposition of Plaintiff's § 1983 claim under the Fourth Amendment "dictates the same result on [her] Article 26 claim." *Mazuz v. Maryland*, 442 F.3d 217, 231 (4th Cir. 2006). Just as summary judgment will be denied on Plaintiff's Fourth Amendment claims, with the exception of her Fourth Amendment excessive force claim as to Officer Phoenix, summary judgment will be denied as to Plaintiff's claims under Article 26. *See id.* ("Although, theoretically, the resolution of claims under the Fourth Amendment and Article 26 can differ, we discern no basis in this record or under Maryland law to support a different construction of these provisions.") (internal citation omitted)).

---

[1] Article 26 provides: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

## 2. Municipal Liability

Defendants argue that Plaintiff's evidence against Montgomery County is insufficient under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (Paper 35, at 23-26). Plaintiff concedes that she cannot prove her municipal liability claim against Montgomery County without additional discovery. (Paper 43, Attach. 1, at 28). As discussed below, Plaintiff will not be permitted to conduct additional discovery. Therefore, summary judgment will be granted in favor of Montgomery County on Plaintiff's municipal liability claim.

## 3. Article III, § 40

Defendants move for summary judgment on Plaintiff's claim under Article III, § 40 of the Maryland Constitution because Plaintiff has not made any claim that her property was taken for public use. Plaintiff agrees to a dismissal of her Article III, § 40 claim. Therefore, Plaintiff's Article III, § 40 claim will be dismissed with prejudice.

## E. Punitive Damages

Defendants move for summary judgment on Plaintiff's claim for punitive damages, asserting that she has no evidence that the officers acted with malice. (Paper 35, Attach. 1, at 30). Plaintiff counters that she has presented evidence that the

officers acted in a hostile and violent manner without an objective basis for doing so. (Paper 43, Attach. 1, at 31).

Assuming that Plaintiff can establish entitlement to compensatory damages against the Defendant Officers, she may only recover punitive damages against them under Section 1983 if she can show their conduct "to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Similarly, under Maryland law, "[p]unitive damages are available against individuals upon a showing of actual malice." *Robles v. Prince George's County*, 302 F.3d 262, 273 (4th Cir. 2002)(citing *Bowden v. Caldor, Inc.*, 350 Md. 4, 23, 710 A.2d 267, 276 (1998)). Plaintiff has provided evidence that the officers unnecessarily restrained, kneed, and Tased her and forced her to go to the hospital in response to her denial of trying to commit suicide and her request for them to leave her home. Viewing the facts in the light most favorable to Plaintiff, there are sufficient disputes of material fact for the jury to decide the question of malice.

**IV. Motion to Modify the Scheduling Order and to Extend Time to Respond to Defendants' Motion for Summary Judgment**

Plaintiff moves to modify the scheduling order to allow additional time for discovery.[1] Plaintiff recounts the following case history:

> Per the Court's Order of May 8, 2009, discovery closed and a status report was due on August 7, 2009 and dispositive motions were due on September 8, 2009. On August 7, 2009, through a joint status report, Plaintiff's former attorney apparently agreed that the parties had completed discovery. However, that same day, Plaintiff's former attorney filed a motion to withdraw his appearance. The Court granted the motion on September 1, 2009.

(Paper 39, Attach. 2, at 2). Plaintiff notes that she was not able to retain new counsel until October 2009, in part because her former attorney would not give her the case file. (Paper 41, at 4-5). Plaintiff now asserts that her former attorney neglected to complete discovery and asks for discovery to be reopened so that she may retain experts to offer opinions as to (1) whether the force used by the officers was reasonable, (2) whether the training offered by Montgomery County was reasonable, (3) what are the appropriate police procedures in cases like this one, and (4) what are the methods,

---

[1] This motion also requested an extension of time to file a response to the motion for summary judgment. That aspect of the motion was granted and Plaintiff's response was filed December 4, 2009. See paper 42.

reasonableness, and appropriateness of Taser usage in this case. (Paper 39, Attach. 2, at 3).

Defendants respond that discovery should not be reopened and that Plaintiff's opposition to their motion for summary judgment was untimely. (Paper 40, at 3-4). Defendants contend that Plaintiff has failed to establish "excusable neglect" by her former attorney under Fed.R.Civ.P. 6(b)(1)(B). (*Id.* at 5).

Because the motion to extend time was filed after the deadline for Plaintiff's opposition brief had passed, Plaintiff's motion will be reviewed pursuant to Fed.R.Civ.P. 6(b)(1)(B). This Rule requires "excusable neglect" for a motion to extend time when the motion is made after the time for the moving party to act has already expired. "[I]nadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable neglect.'" *Thompson v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 533 (4th Cir. 1996). While Plaintiff had ample time to find a new attorney and respond to Defendants' motion for summary judgment, Plaintiff's delay in responding did not prejudice Defendants.

Fed.R.Civ.P. 16(b) governs the modification of a scheduling order. District courts have broad discretion to manage the timing of discovery, *Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir. 1986), *cert. denied*, 480 U.S. 934 (1987), and

the only formal limitation on this discretion with respect to consideration of motions to amend scheduling orders is that the moving party demonstrate good cause. Fed.R.Civ.P. 16(b)(4). "Good cause" is shown when the moving party demonstrates that the scheduling order deadlines cannot be met despite its diligent efforts. *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D.Md. 1999)(quoting *Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co.*, 986 F.Supp. 959, 980 (D.S.C. 1997), *aff'd by unpublished opinion*, 129 F.3d 116 (Table), 1997 WL 702267 (4th Cir. 1997).

The parties have briefed the issue of excusable neglect under Rule 6(b)(1)(b) instead of good cause under Rule 16(b). Nevertheless, Plaintiff had ample time to conduct discovery. The discovery deadline was extended twice, from December 8, 2008 to February 23, 2009 and later August 7, 2009. Plaintiff's former attorney propounded written discovery on all four officers and Montgomery County. Plaintiff's new counsel has not shown why Plaintiff's former attorney lacked diligence in conducting discovery. Plaintiff will not be allowed to conduct additional discovery and the scheduling order will not be modified. Therefore, Plaintiff's motion will be denied as to her request for additional time for discovery.

## V. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part and denied in part and Plaintiff's motion to modify the scheduling order to allow further discovery will be denied.  A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge