IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELISSA DENT

       v.

ADAM SIEGELBAUM, et al.

      :
      :
      :  Civil Action No. DKC 08-0886
      :
      :

**MEMORANDUM OPINION**

Presently pending and ready for review in this civil rights case is the motion for a new trial filed by Plaintiff Melissa Dent (ECF No. 137). The issues have been fully briefed and the court now rules, no hearing deemed necessary. Local Rule 105.6. For the following reasons, the motion will be denied.

**I. Background**

The present case stems from an incident that occurred at the residence of Plaintiff Melissa Dent in Montgomery County, Maryland, on October 7, 2007. Defendants Adam Siegelbaum, John Mullaney, Kimberly Wilson, and Jennifer Phoenix were the Montgomery County police officers dispatched to Plaintiff's home to respond to a 911 call from Plaintiff's friend, Sabrina Gorham. Ms. Gorham indicated that Plaintiff had taken some pills and requested emergency assistance and an ambulance. Upon arrival, Defendants concluded that Plaintiff should be taken to the hospital for an emergency mental evaluation. Plaintiff

resisted and Defendants ultimately deployed a taser multiple times to restrain her.

After the court resolved motions to dismiss and for summary judgment, two claims remained:  (1) a claim against all four police officers for an unconstitutional seizure of Plaintiff in violation of the Fourth Amendment to the United States Constitution and Article 26 of the Maryland Declaration of Rights, and (2) a claim that Defendants Siegelbaum, Mullaney, and Wilson used excessive force in violation of the Fourth Amendment and Article 26.  A seven-day jury trial took place in March 2011.  On March 28, 2011, the jury reached a unanimous verdict finding that the Defendants were not liable on any count.  (ECF No. 131).  On April 25, 2011, Plaintiff filed a motion for a new trial.  (ECF No. 137).  Defendants filed an opposition.  (ECF No. 140).  Plaintiff filed a reply.  (ECF No. 141).

## II.  Standard of Review

Motions for a new trial are governed by Fed.R.Civ.P. 59. This rule provides that after a jury trial "[t]he court may, on motion, grant a new trial on all or some of the issues–and to any party–. . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed.R.Civ.P. 59(a)(1)(A).  Whether to grant a new trial "rests

within the sound discretion of the trial court but such discretion must not be arbitrarily exercised." *Richmond v. Atl. Co.*, 273 F.2d 902, 916 (4th Cir. 1960); *see Atkinson Warehousing & Distrib., Inc. v. Ecolab, Inc.*, 115 F.Supp.2d 544, 546 (D.Md. 2000), *aff'd*, 15 F.App'x 160 (4th Cir. 2001). A district court "must set aside the verdict and grant a new trial if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).

An error is insufficient cause for a new trial, unless the error caused prejudice. *See* Fed.R.Civ.P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence-or any other error by the court or a party-is ground for granting a new trial[.] At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 11 *Fed. Prac. & Proc. Civ.* § 2805 (2d ed.) ("[I]t is only those errors that have caused substantial harm to the losing party that justify a new trial. Those errors

that are not prejudicial do not call for relief under Rule 59."). Evidentiary errors are harmless if the court can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]." *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (citations and quotation marks omitted), *abrogated on other grounds as recognized in Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (same); *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995) (same), *cert. denied*, 516 U.S. 1083 (1996).

Plaintiff also moves for relief from final judgment on the grounds of fraud, misrepresentation, or other misconduct of an opposing party pursuant to Fed.R.Civ.P. 60(b)(3). "[T]o prevail on a Rule 60(b)(3) motion: (1) the moving party must have a meritorious [claim or] defense; (2) the moving party must prove misconduct by clear and convincing evidence; and (3) the misconduct prevented the moving party from fully presenting its case." *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) (*citing Spare Const. Co. v. WMATA*, 657 F.2d 68, 71 (4th Cir. 1981).

## III.  Analysis

Plaintiff argues that a new trial and/or relief from final judgment is warranted because the court erred in (1) providing the jury instructions; (2) admitting the 911 tape into evidence; (3) admitting testimony from Dr. Emily Gordon; (4) admitting expert testimony from Dr. Blumberg; (5) denying Plaintiff's request to enforce a trial subpoena to obtain Montgomery County's Internal Affairs File; (6) denying admission of postings from a web forum discussing the incident; (7) denying Plaintiff's request to allow counsel to demonstrate using a taser before the jury and to play videos of the taser in action; and (8) failing to grant Plaintiff's motion for a continuance of the trial or to reopen discovery.  Each basis will be discussed in turn.

### A.   Jury Instructions

Plaintiff argues that the jury instructions contained a number of errors that warrant a new trial.  In reviewing Plaintiff's arguments, it is important to keep in mind that jury instructions must be viewed holistically.  The Fourth Circuit recently reiterated guidance from the Supreme Court that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."  *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011)

(quoting *Henderson v. Kibbe*, 431 U.S. 145, 153 n.10 (1977)), *cert. denied*, 132 S.Ct. 516 (2011) (No. 11-285).   The Fourth Circuit further instructed:

> It is easy enough to pick at words, phrases, and sentences in a charge, but that overlooks the fact that the charge in its totality was what the jury heard.   A jury verdict, moreover, represents a good deal of work on the part of a good many people, and the instructions undergirding that collective effort should not succumb lightly to semantic fencing.   Accordingly, we simply determine "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party."

*Id.* (quoting *Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996)).   These principles guide the analysis of Plaintiff's arguments.

## 1.   Missing Witness Instruction

Plaintiff first argues that the court's failure to give a missing witness instruction or to permit Plaintiff's counsel to argue the issue to the jury was in error.   (ECF No. 137, at 3-7).   Plaintiff contends that this instruction was appropriate as to Young Sun Kim, a Montgomery County fire and rescue worker ("EMT") present at the scene of the incident on October 7, 2007, and currently a police officer for Montgomery County.   Plaintiff also contends that the instruction may have been appropriate for

the three to four other EMTs present at Plaintiff's home that night. *Id.*

A missing witness instruction may be given if the failure of a party to call a witness permits an inference that the witness' testimony would be unfavorable to that party's case. *United States v. King*, 155 F.3d 562 (4th Cir. 1998) (table opinion), *cert. denied*, 525 U.S. 973 (1998).  The instruction is appropriate if two requirements are met:

> First, it must be shown that the party failing to call the witness has it peculiarly within its power to produce the witness by showing either:  a) that the witness is physically available only to the other party, or b) that, because of the witness's relationship with the other party, the witness pragmatically is only available to that party.  Second, the witness's testimony must elucidate issues important to the trial, as opposed to being irrelevant or cumulative.

*Id.* (internal citations omitted); *see also United States v. Brooks*, 928 F.2d 1403, 1412 (4th Cir. 1991), *cert. denied*, 502 U.S. 845.  As the United States Court of Appeals for the Second Circuit has recognized, an "aura of gamesmanship" frequently accompanies requests for missing witness instructions and as a result district court judges are afforded considerable discretion in deciding when to give the instruction. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1215 (2d Cir. 1994), *cert. denied*, 513 U.S. 1084 (1995); *United States v. Torres*, 845 F.2d

1165, 1170-71 (2[d] Cir. 1988).  The instruction is not appropriate where the witness is available to both parties.  *Jones v. Meat Packers Equip. Co.*, 723 F.2d 370, 373 (4th Cir. 1983).  The Fourth Circuit has determined that the supposed "missing witness" was equally available to both parties where the witness was present in court during the trial and the attorney seeking the instruction had declined the court's offer to call the witness, *Jones*, 723 F.2d at 373, and where the party requesting the instruction had not sought to call the witness and did not make any effort to require the government to call the witness.  *United States v. Chase*, 372 F.2d 453, 467 (4th Cir. 1967)*, cert. denied*, 387 U.S. 907 (1967).  Moreover, at least two circuits, the Fifth and Sixth, have expressed the view that the instruction is anachronistic and no longer appropriate in cases subject to the Federal Rules of Evidence and Federal Rules of Civil Procedure.  *See Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1048 (5th Cir. 1990); *Allstate Ins. Co. v. Shuler*, 53 F.3d 331 (6th Cir. 1995) (table opinion).  The Fifth Circuit explained in *Herbert*:

> A litigant may use modern discovery procedures to ascertain the identity and proposed testimony of witnesses identified with her opponent. If the district court finds that a party is concealing the identity and location of persons with knowledge of discoverable matter, the court may impose an appropriate penalty.  If a

8

> litigant wishes to call a hostile witness
> but the witness is unwilling to testify, the
> litigant may resort to compulsory process.
> When the litigant has the hostile witness on
> the stand, she may use leading questions to
> interrogate the witness, and if necessary
> impeach the witness under Rule 607 by any of
> the standard means, including use of the
> witness's prior inconsistent statements.

911 F.2d at 1048.

Here, Ms. Kim's identity was provided by Defendants' counsel during discovery. There is no evidence that Plaintiff attempted to depose Ms. Kim or to subpoena Ms. Kim to testify at trial. Even at trial, when asked if he wished to call Ms. Kim as a witness, Plaintiff's counsel indicated that he did not. Plaintiff cannot make deliberate choices not to obtain discovery from an individual, express no desire to call her as a witness, offer no evidence that the witness refused to testify, and then contend she is unavailable.[1] Similarly, Defendants have produced affidavits from two of the other EMTs indicating that they were subpoenaed by Plaintiff to testify at trial and were expecting to do so, but that Plaintiff's counsel ultimately elected not to call them. (ECF No. 140-2, Wister Bryant Aff.; ECF No. 140-3,

---

[1] Plaintiff argues in her reply that Ms. Kim would not agree to speak with Plaintiff's counsel about the case without an attorney present. Plaintiff's argument does not indicate that her counsel employed any of the array of available discovery tools to ascertain Ms. Kim's testimony.

Carl Ritter Aff.).   Witnesses are not missing or unavailable simply because a party chooses not to call them.  *Cf. Jones*, 723 at 373; *Chase*, 372 F.2d at 467.

In support of her broad interpretation of the instruction's applicability, Plaintiff relies heavily on the Seventh Circuit's opinion in *Yumich v. Cotter*, 452 F.2d 59 (7th Cir. 1971), *cert. denied*, 410 U.S. 908 (1973).  In *Yumich,* the Seventh Circuit held that ten to fifteen police officers who may have witnessed or even been involved in an incident that was the subject of a civil rights lawsuit and were present in the courthouse during the trial were pragmatically unavailable to the plaintiffs because they were employees of the defendant and there was strong likelihood of bias toward the defendant if they were called to testify.  *Id.* at 64.  Although the City of Chicago was the only defendant at the time of the appeal, the conduct of the non-testifying police officers was the focus of the suit. *Yumich*'s understanding of pragmatic unavailability was extremely broad and, in the nearly forty years since that decision, courts have found the instruction appropriate in far fewer circumstances than *Yumich*'s holding might suggest. Additionally, *Yumich* was decided before Fed.R.Evid. 607 was enacted and did away with the voucher rule.  *Yumich*, therefore, does not dictate the result Plaintiff desires.

In sum, Plaintiff has not established that the missing witness instruction was appropriate under the circumstances.

## 2. Spoliation

Plaintiff next argues that the court erred in denying her request for a spoliation instruction with respect to the digital pictures taken of Plaintiff after the tasing. These pictures were deleted when Defendant Siegelbaum connected the digital camera to his computer for uploading.

"Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). Spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d 494, 505 (D.Md. 2009). A party seeking sanctions for spoliation, such as an adverse inference instruction, must prove the following elements:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that

> the lost evidence would have supported the
> claims or defenses of the party that sought
> it.

*Id.* at 509 (citing *Thompson v. United States Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 101 (D.Md. 2003)). "An adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Vodusek*, 71 F.3d at 156. The test is not whether the individual intended to engage in the action that led to the destruction of the evidence, but whether they intended to destroy the evidence. *See, e.g., Meyer v. Boddie-Noell Enters., Inc.*, No. 3:10cv386, 2011 WL 201524 (E.D.Va. Jan. 5, 2011) (finding spoliation inference inappropriate where a lost camera was mailed by defendant to his home office and defendant did not save the empty envelope that was delivered without the camera), *judgment adopted by* No. 3:10cv386, 2011 WL 221298 (E.D.Va. Jan. 21, 2011).

Here the spoliation instruction was not appropriate because there was no evidence to prove, or even to suggest, that Defendant Siegelbaum intended to destroy the pictures.

### 3.  Negligence

Plaintiff next argues that the court's instruction as to the standard for negligence was in error.   The negligence instruction given to the jury was:

> An act is negligent if a defendant was under a duty or obligation, recognized by law, that required him or her to adhere to a certain standard of conduct to protect others against unreasonable risks, and he or she breached that duty or obligation. Remember that someone's mere negligence is an insufficient basis on which to find that such person violated another person's constitutional rights.

(ECF No. 127, at 12).   Plaintiff argues that this instruction was flawed because it permitted the jury to conclude that an intentional breach of an obligation to act with reasonable care would not give rise to liability.   (ECF No. 137, at 11).

Any lack of clarity as to whether intentional acts could constitute negligence was remedied in a subsequent communication with the jury.   In the course of their deliberations the jury asked for clarification of the difference between "an intentional act, a reckless act, and a merely negligent act." (ECF No. 129, at 4).   The court provided a note stating:

> In response to your question, I can offer the following:
> In order to prove her claim, Plaintiff must show that the defendant acted with the intent to deprive her of her rights or with reckless indifference to those rights. An act is intentional if it is done voluntarily

13

> and deliberately and not because of mistake,
> accident, negligence or other innocent
> reason. An act is reckless if done in
> conscious disregard of its known probable
> consequences. In other words, even if a
> defendant did not intentionally seek to
> deprive Plaintiff of her rights, if
> nevertheless she or he purposely disregarded
> the high probability that her or his actions
> would deprive Plaintiff of her rights, then
> this aspect of the claim would be satisfied.
> On the other hand, negligence or lack of due
> care is the unintentional failure to
> exercise ordinary, reasonable care and,
> unless rising to the level of recklessness,
> would not be enough for liability.

(*Id.* at 5).  This clarification made explicit that intentional acts could not constitute negligence.

Plaintiff's attempt to argue in the abstract that the negligence instruction may have allowed the jury to conclude that an intentional breach of a duty of care was negligent, and therefore not actionable, falls short when the instruction is considered in the appropriate context.  The applicable standards of conduct at issue were those for emergency evaluation petitions ("EEP") and the use of force.  Specifically the jury was instructed that "before a police officer may take an individual into custody for an EEP, the officer must have probable cause to believe that the person has a mental disorder and presents a danger to the life or safety of the individual or others."  (ECF No. 127, at 12).  With respect to the use of force the jury was instructed that the officers "may only employ

14

the amount of force necessary under the circumstances to detain an individual." (*Id.* at 13). An officer acting with the intent to breach either of these standards of care would thus be acting with the intent to take an individual into custody without probable cause or with the intent to use excessive force. The instructions left no question that if the jury reached such a conclusion the intent requirement was established. Because the negligence instruction was not given in isolation, Plaintiff's concerns were and remain unfounded.

### 4.   Bailey v. Kennedy Instruction

Plaintiff next argues that the court's refusal to give an instruction in accordance with the Fourth Circuit's decision in *Bailey v. Kennedy*, 349 F.3d 731, 740-41 (4th Cir. 2003), was in error. (ECF No. 137, at 12). *Bailey* considered whether police officers had probable cause to seize an individual for an emergency mental evaluation. *Id.* at 739.[2] In reaching its decision that the police officers lacked probable cause in *Bailey*, the Fourth Circuit emphasized that its analysis was

---

[2] In *Bailey*, police officers had arrived at the plaintiff's house in response to a neighbor's report that the plaintiff was at home alone, intoxicated, and suicidal. The first officer to arrive entered the plaintiff's home and confirmed through conversation that the plaintiff was alone and intoxicated, but the plaintiff reiterated that he was not suicidal. Nonetheless, the officers determined that an emergency evaluation was needed and proceeded to restrain plaintiff with force.

fact-specific and gave examples of certain factors police officers may consider relevant to the decision to conduct an EEP. *Bailey* was a decision reviewing the district court's summary judgment ruling; no jury trial had taken place and the Fourth Circuit made no holding as to the requirement for jury instructions in emergency evaluation cases.

Nevertheless, Plaintiff argues that because this court did not give the jury an instruction that specifically referenced the types of evidence the jury should consider when assessing probable cause the instructions were deficient.  In particular Plaintiff argues that it was not clear from the court's instruction that the jury should only consider the factors that were known to the officers at the time they encountered the Plaintiff in her home and not any after-acquired facts.[3]

_____

[3] The specific instruction requested by Plaintiff was:

> "[T]he law in no way permits random or baseless detention of citizens for psychological evaluations," and a 911 call alone does not justify the detention of a citizen for a psychological evaluation. The officers must take into account other factors, such as whether the individual is visibly distraught or crying, what he or she was doing, whether there were weapons or other suicide preparations evident, whether the individual admitted or denied any suicide reports, and whether the individual told the officers they needed to leave.

16

As an initial matter, Plaintiff's argument fails because the instruction proposed by Plaintiff makes no reference to after acquired facts.  Thus, to the extent this is the defect Plaintiff was seeking to cure, her proposal would not have done so.  More importantly, however, the jury was instructed that "the presence or absence of probable cause is to be judged under the totality of circumstances and from an objective viewpoint," and that "[t]he standard of 'reasonableness' under the Fourth Amendment is wholly objective; the question is whether an officer's actions were 'objectively reasonable' in light of the facts and circumstances confronting him or her."  These instructions were adequate to inform the jury of its duty to consider all the facts known to the officers, not solely the 911 call and not facts unknown to the officers at the relevant time. The instructions were appropriate and did not conflict with the Fourth Circuit's holding in *Bailey*.

**5.  Active v. Passive Resistance**

Next, Plaintiff argues that it was an error not specifically to instruct the jury to consider whether Plaintiff was actively or passively resisting arrest and that an officer

---

(ECF No. 137, at 12).

17

who believes a subject is mentally disturbed must make a greater effort to control the situation through less intrusive means. Plaintiff contends that the court's instructions did not permit the jury to take into account Plaintiff's resistance, or lack thereof, when assessing the necessity for the use of the force and whether the force used was reasonable.  Defendants argue that the evidence showed Plaintiff was actively resisting arrest and thus the court's instruction adequately accounted for the Supreme Court's ruling in *Graham v. Connor*, 490 U.S. 386, 396 (1989), stating that whether one is actively resisting arrest is a relevant factor for the use of force.  (ECF No. 140, at 8).

The jury was instructed that:

> In determining what amount of force is objectively reasonable under the circumstances, you should consider that police officers are often forced to make split second judgments, under tense, dangerous, and rapidly moving circumstances, about the amount of force necessary to effect a particular detention. Careful consideration of the exigencies of each particular situation is the appropriate and effective way to ensure that police officers are not unduly inhibited in the performance of their duties.

The Fourth Circuit recently confirmed that in an excessive force case, instructions that provide the jury with a "general rubric of reasonableness" are appropriate and leave counsel with "more than enough room to argue the facts in light of that standard."

18

*Noel*, 641 F.3d at 587.   In *Noel*, the plaintiff had sought a specific instruction addressing the reasonableness of police officers' third gunshot in an arrest.   *Id.*   In upholding the district court's decision to reject this instruction, the Fourth Circuit affirmed that good jury instructions state a general standard and leave to counsel to argue the general statement's application to the specific facts of a case.   "[D]istrict judges are not required to comment on the evidence, and their refusal to single out any particular item of evidence is often a sensible approach to evenhandedness in the presentation of the law."   *Id.* (quoting *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1421 (4th Cir. 1991)).   Here, the jury was properly instructed on the relevant standard and Plaintiff's counsel was free to argue in his closing that Plaintiff did not actively resist.   No error was made.

**B.   Admission of 911 Tape**

Plaintiff contends that the court erred in allowing Defendants to play a portion of the tape recording of the 911 telephone call from Ms. Gorham to an emergency dispatcher on October 7, 2007.   (ECF No. 137, at 16).   Plaintiff objects to the admission of this recording by arguing that it contains hearsay, was irrelevant, and was cumulative.

19

Not all out of court statements or recordings thereof are inadmissible. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801. Thus, out-of-court statements not offered for the truth of the matter asserted are not hearsay and not inadmissible.[4]

As was explained when Plaintiff objected at trial, the 911 tape was not admitted to prove the truth of the statements made by Ms. Gorham or the emergency dispatcher. Instead, Defendants were permitted to play a portion of the full recording for the limited purpose of allowing the jury to hear the voices of Ms. Gorham and Plaintiff, particularly their tone and their choice of words. This evidence was relevant and not cumulative because it conveyed the sense of urgency and Plaintiff's demeanor at the time, in a manner not evident from the testimony of Ms. Gorham and Plaintiff. There was no prejudice because Plaintiff and Ms. Gorham had already testified that the words were spoken. Additionally, the jury was clearly instructed before the tape

---

[4] Plaintiff does not argue that the recording itself was inadmissible, but instead focuses her arguments on the statements recorded on the tape. The 911 recording itself, even if considered hearsay, was admissible as a public record pursuant to Fed.R.Evid. 803(8).

was played that they were to consider the recording for a limited purpose and none of the statements were to be taken for the truth of the matter asserted.  Instead, the jury was to use the recording only to aid in its evaluation of the testimony of Ms. Gorham and Plaintiff.  The jury was also reminded that the Defendant officers never heard the tape or the conversation it recorded.  For all these reasons, the recording was properly admitted.

### C.  Testimony of Dr. Emily Gordon

Plaintiff contends that the testimony of Dr. Emily Gordon should not have been admitted because she had no personal knowledge of the facts of the case and the testimony she gave regarding the number of pills ingested by Plaintiff was irrelevant.  (ECF No. 137, at 19).  Plaintiff argues that the court should have either stricken Dr. Gordon's testimony from the record or taken judicial notice of the proper dosage of Amitriptyline per the Physician's Desk Reference ("PDR") and instructed the jury accordingly.  (*Id.*).

Plaintiff's argument regarding Dr. Gordon's lack of knowledge is misplaced.  Dr. Gordon was Plaintiff's treating physician at Shady Grove Hospital the night of October 7, 2007. Dr. Gordon did not lack personal knowledge; she simply no longer recalled the details of her encounter with Plaintiff in 2007.

Because Dr. Gordon had taken notes to document her conversation with Plaintiff at the hospital, it was appropriate for her use those notes to aid in her testimony.   Fed.R.Evid. 803(5) specifically provides for this practice, stating:

> (5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

In this instance, the hospital records identified as Defendant's Exhibit 8 and shown to Dr. Gordon meet the requirements for Rule 803(5).   Dr. Gordon's records were prepared contemporaneously with her treatment of Plaintiff and reflect Dr. Gordon's knowledge at that time.   In accordance with Rule 803(5)'s dictates, the records themselves were not admitted, but Dr. Gordon was properly permitted to testify regarding the statements she had recorded in the past as they accurately reflected Dr. Gordon's impressions of the Plaintiff at the hospital on the night in question.

Plaintiff's argument with respect to the PDR is irrelevant. The reason the request to take judicial notice of the PDR was

denied was not that the PDR cannot be the subject of judicial notice.   The request was denied because information regarding the proper dosage of Amitriptyline was deemed irrelevant to the questions before the jury.   This determination is not altered by the fact that Dr. Gordon testified as to the number of pills Plaintiff reported taking.

**D.   Testimony of Dr. Blumberg**

Plaintiff argues that several aspects of the testimony of Dr. Blumberg were improperly admitted.

First, Plaintiff argues that the jury should not have heard testimony from Dr. Blumberg regarding Plaintiff's blood alcohol concentration ("BAC") test results.   Plaintiff challenges the accuracy of the blood alcohol testing on four grounds:  (1) the test did not account for the possibility of a false positive because an alcohol swab was used to clean Plaintiff's skin prior to drawing a blood sample; (2) the test was conducted on a serum blood sample rather than a whole blood sample; (3) the hospital did not account for a potential false positive or inflated results due to other drugs consumed by Plaintiff; and (4) the hospital did not account for a potential false positive due to Plaintiff's simultaneous IV fluid intake.  (ECF No. 137, at 21–23).

As an initial matter, Plaintiff's arguments misconstrue the nature of Dr. Blumberg's testimony.   Dr. Blumberg did not personally conduct the BAC test, and he was not proffered to opine on its reliability.   Instead, he was called to explain how Plaintiff's alcohol and drug consumption may have affected her demeanor, appearance, memory, and other physical or mental characteristics.   He relied on the BAC test in forming his conclusions, but his analysis was not dependent solely on the accuracy of the BAC test.   Additionally, Plaintiff's counsel questioned Dr. Blumberg about each alleged flaw with the BAC test during his cross examination, and, thus, Plaintiff was able to present the jury with her concerns about the test results.

Indeed, the potential methodological flaws suggest only minor deviations from the correct result.   With respect to the use of an alcohol swab, Dr. Blumberg agreed that its use could cause a slight increase in the BAC.   This testimony is not inconsistent with the literature cited in Plaintiff's brief. The quoted excerpt indicates that use of an alcohol swab may lead to a false positive test result.   (ECF No. 137, at 21). This concern is entirely inapplicable to the situation at hand. There is no dispute that Plaintiff had consumed multiple alcoholic beverages on the night in question, and it was not a situation where anyone could expect a BAC test to show no trace

of alcohol in the blood.   With respect to the use of serum rather than whole blood, Dr. Blumberg testified that this was standard hospital practice and disputed Plaintiff's counsel's proffer that using serum could overstate the amount of alcohol by 20% or more.   Plaintiff's citation to one periodical reaching a different conclusion is not justification to strike Dr. Blumberg's testimony.   With respect to the Plaintiff's two final points — that other medicines and IV fluid administration might have affected the results — Dr. Blumberg conceded these points, but stated that he thought the effect would be minimal.   Minor discrepancies in the BAC test result would not significantly affect Dr. Blumberg's analysis.

Plaintiff next argues that it was improper to permit Dr. Blumberg to testify about Plaintiff's behavior the night of the incident because he had no foundation or scientific basis for his testimony.   (ECF No. 24).   Plaintiff's argument here misrepresents the content of Dr. Blumberg's testimony.   Dr. Blumberg testified about how an average person with a blood alcohol level of .284 and who had taken two to four pills of Amitriptyline might act.   Based on his prior experience, Dr. Blumberg was qualified to offer this testimony.   And again, when questioned by Plaintiff's counsel, Dr. Blumberg agreed that individuals have unique responses to alcohol consumption and

that factors such as food consumption can impact the body's tolerance.

Finally, Plaintiff argues that the court erred in denying her request for a *Daubert* hearing on the admissibility of Dr. Blumberg's opinions. This argument is also without merit. Notably, when Plaintiff's counsel requested a *Daubert* hearing at a pre-trial motions hearing, counsel admitted that he had no witnesses that he intended to call at such a hearing. *Daubert* hearings are not mandated in all cases and, as a general matter, trial judges have significant discretion in determining the admissibility of expert opinion. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The trial court must have [discretionary] latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability[.]"). Where Plaintiff still cannot identify any substantial flaw in Dr. Blumberg's testimony, there is no reason to conclude that a *Daubert* hearing was necessary. To the contrary, such a hearing would have imposed just the sort of "unjustifiable expense and delay" the Federal Rules of Evidence aim to avoid. *Id.* (citing Fed.R.Evid. 102).

In all, none of the alleged flaws rendered Dr. Blumberg's testimony inadmissible.

**E.   Internal Affairs File**

Next, Plaintiff argues the court's refusal to enforce the trial subpoena she served on Montgomery County was an error. Plaintiff's use of a trial subpoena *duces tecum* to attempt to gain access to the internal affairs file was not proper, however, so there was no error.

Trial subpoenas are typically used to ensure the availability at trial of original documents previously disclosed by discovery. *See, e.g., Rice v. United States*, 164 F.R.D. 556 (N.D.Okla. 1995); *Mortg. Info. Servs., Inc. v. Kitchens*, 210 F.R.D. 562, 567 (W.D.N.C. 2002) (citing *Rice*).   In addition, some courts have stated as a general principle that trial subpoenas may be used refresh a witness's memory.   *See id.* (citing *Puritan Inv. Corp. v. ASLL Corp.*, No. Civ. A. 97-1580, 1997 WL 793569, at *1 (E.D.Pa. Dec. 9, 1997)).   Trial subpoenas are not substitutes for discovery.   As stated in a case upon which Plaintiff relies, a party cannot use a trial subpoena to obtain documents that were requested - but not produced - during the course of discovery if the party did not seek to compel their production prior to discovery's close.   *Kitchens*, 210 F.R.D. at 567 (citing *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 588 (W.D.N.Y. 1995)).   Another case cited by Plaintiff, *Rice*, likewise acknowledged that a situation might

27

arise where Rule 45 could be invoked to obtain materials outside of discovery, but on the facts of the case quashed the subpoena because it sought documents that could and should have been pursued during the authorized discovery period. 164 F.R.D. at 559. The subpoena at issue in *Puritan Investment Corp.* was likewise quashed and the court there explained:

> There is absolutely no indication that plaintiff knows what information is contained in the documents it seeks or that they would support plaintiff's theory of its case. A trial subpoena is not an appropriate means of ascertaining facts or uncovering evidence. This should be done through discovery in the manner and time provided by the Federal Rules and court order.

1997 WL 793569, at *2. The *Puritan* court also emphasized that the plaintiff did not and could not credibly aver that it was unaware of the possible existence of the subpoenaed documents before the discovery deadline. *Id.* ("when a [party] . . . is aware of the existence of documents before the discovery cutoff date and issues discovery requests including subpoenas after the discovery deadline has passed, then the subpoenas and discovery requests should be denied" (quoting *McNerney*, 164 F.R.D. at 588)). Plaintiff's counsel was aware of the internal affairs file long before trial. At the pre-trial hearing, Plaintiff's counsel was unable to identify any specific document or documents within the internal affairs file needed to refresh any

28

witness's recollection or for any other specific purpose. Counsel's responses confirmed that the subpoena was not a proper trial subpoena. Instead, it was an improper and belated discovery request.

Plaintiff also cites two cases holding that Rule 45 subpoenas to third parties are not discovery and can be served after discovery deadlines, (ECF No. 137, at 33 (citing *O'Boyle v. Jensen*, 150 F.R.D. 519 (M.D.Pa. 1993); *Multi-Tech Sys., Inc. v. Hayes Microcomputer Prods., Inc.*, 800 F.Supp. 825 (D.Minn. 1992)), and argues that because Montgomery County is not a party its subpoena should have been enforced. Plaintiff fails to mention that these two cases represent the minority view and that most courts interpret Rule 45 subpoenas as discovery, *see, e.g., Kitchens*, 210 F.R.D. at 567. Plaintiff's second argument overlooks the fact that Montgomery County was originally a named Defendant in this case and it remained a party during the discovery period. Indeed, Plaintiff requested the internal affairs file from Montgomery County through discovery, but she never sought to compel its production.

### F.   Internet Postings

Plaintiff argues that the four Defendants committed fraud by refusing to admit to authorship of a series of internet posts containing information about Plaintiff and this case. Plaintiff

maintains that only the Defendants could have written the posts and that they were relevant and admissible at trial because they could have impeached Defendants' recollection of the events on the evening in question, they are prior bad acts evidence, and they are evidence of bias.

Plaintiff's arguments as to the postings' relevance are only valid if Plaintiff can establish authorship of the posts. The fact that anonymous individuals made comments about Plaintiff's case, often in offensive terms, on its own is not relevant to any of the disputed issues of the cases. Plaintiff cannot rely on insinuation and argument to prove that any of the Defendants authored the posts and Plaintiff offers nothing else. Trial was far too late for Plaintiff to conduct a fishing expedition to attempt to link the posts to any of the Defendants and, as a result, those posts were properly excluded from trial.

Plaintiff's allegation of fraud or misconduct from Defendants or their counsel similarly suffers from a lack of proof. Fraud is a serious allegation and granting relief from judgment on that basis requires substantial proof. Plaintiff has offered nothing more than suggestions of inconsistency and her own hypothesis.

### G.    Taser Gun and Videos

Plaintiff was not permitted to demonstrate the use of the taser in court or to show videos of taser training.[5]  According to Plaintiff, both rulings precluded the jury from understanding the taser's capabilities and effects, and, thus, the jury was in no position to assess whether using a taser constituted reasonable force under the circumstances.  (ECF No. 137, at 38).

Courtroom demonstrations are subject to the rules of evidence.   Accordingly,  the  proponent  of  a  proposed demonstration must show that the demonstration is relevant and not unduly prejudicial.   *United States v. Williams*, 461 F.3d 441, 446 (4th Cir. 2006), *cert. denied*, 549 U.S. 1047 (2006).  "A courtroom demonstration that purports to recreate events at issue is relevant if performed under conditions that are 'substantially similar to the actual events.'"   *Id.* (quoting *Hinkle v. City of Clarksburg*, 81 F.3d 416, 425 (4th Cir. 1996)). If  the  differences  between  the  demonstration  and  the  actual occurrence are significant, "the trial judge is justified in concluding either that the evidence is totally lacking in probative value as to any material issue, or that the probative value  of  the  evidence  is  overborne  by  the  danger  that

---

[5] Plaintiff's counsel requested permission to demonstrate the taser himself during opening statements, closing arguments, and in examining witnesses.

introduction of the evidence will tend to confuse the issues, unnecessarily prolong the trial, or create a likelihood of undue prejudice." *Id.* (quoting *Renfro Hosiery v. Nat'l Cash Register Co.*, 552 F.2d 1061, 1065 (4th Cir. 1997)).

In this case, all the relevant considerations pointed toward denying Plaintiff's request to demonstrate the taser in court. All the testifying witnesses who were present at Plaintiff's home the night of Oct 7, 2007, were able to speak about the night's events, including the use of the taser and its effects on Plaintiff. This testimony was adequate to explain how a taser functioned. It may also have been appropriate for Plaintiff to call as a witness an individual with particular knowledge as to the function and use of tasers. Plaintiff's former counsel failed to designate such an individual in a proper and timely fashion, however, so this avenue was foreclosed. Even with an appropriately designated and admitted expert witness, however, it is hard to imagine a scenario in which it would be necessary for that expert to discharge the taser in open court. Plaintiff certainly did not provide such a scenario either at trial or in her post-trial briefs.

The fact that a few other courts have permitted taser demonstrations in court does not, as Plaintiff intimates, mean that taser demonstrations are always appropriate or that failure

to allow such a demonstration is adequate justification for a new trial.  Additionally, the cases cited by Plaintiff are not binding on this court and largely distinguishable.  In the unpublished Fourth Circuit case referenced by Plaintiff, *Sumpter v. Han*, 208 F.2d 210 (4th Cir. 2000) (table opinion), it appears that the officer was permitted to demonstrate how a stun gun was used as a baton; he was not permitted to fire the stun gun in open court.  In *United States v. Myers*, 972 F.2d 1566, 1580 (11th Cir. 1992), while the Eleventh Circuit held that the trial judge had not abused his discretion in permitting a stun gun demonstration in court, it recognized that because both the prosecution and the defense had activated the stun gun on numerous occasions, there was no merit to the defendant's prejudice argument.  In this case, Defendants did not wish to demonstrate the taser, so the prejudice argument remains viable. In the few Texas and New York state court decisions cited by Plaintiff, witnesses that were either experts or police officers were permitted to demonstrate use of electronic control weapons. *See People v. Brower*, 728 N.Y.S.2d 182 (N.Y.App.Div. 2001) (upholding trial judge's decision to permit police detective to demonstrate use of stun gun); *Grunsfeld v. State*, 813 S.W.2d 158, 164 (Tex.Ct.App. Dallas 1991) (permitting investigator to testify about stun gun and demonstrate its use); *Lyon v. State*,

No. 04-94-00320-CR, 1996 WL 269478 (Tex.Ct.App. May 22, 1996) (prosecutor demonstrated use of stun gun in closing after expert witness introduced gun).[6]

With respect to the taser training video, Plaintiff failed to establish that the video had been seen by the Defendants prior to the incident at Plaintiff's home. Absent such a link, the video was not relevant.

### H.   Failure To Grant Continuance of Reopen Discovery

Finally Plaintiff argues that the court should have granted its request for a continuance or to reopen discovery.

On two prior occasions, Plaintiff's requests to reopen discovery or amend the schedule have been denied. (*See* ECF Nos. 48, 49, 57, 58). The decisions of Plaintiff's former counsel remain binding on Plaintiff. *See, e.g., Link v. Wabash R. Co.*, 370 U.S. 626, 663 (1962); *Robinson v. Wix Filtration Corp., LLC*, 599 F.3d 403, 409 (4th Cir. 2010).[7] Plaintiff now

---

[6] Plaintiff separately lists the decision of the Western District of Texas denying the *Lyon* defendant's habeas petition from the defendant in this case as another example of a court approving a stun gun demonstration. (*See* ECF No. 137, at 43 (citing *Lyon v. Cockrell*, 2003 U.S.Dist. LEXIS 7951 [2003 WL 21077419], at *23-24 (W.D.Tex. May 8, 2003)).

[7] Plaintiff references this court's statement in a prior opinion that courts have not held parties to the errors or neglect of their attorneys "where the errors or neglect of an attorney result, or would result, in a final, involuntary

tries to argue that a continuance and additional discovery would have benefitted both parties because Defendants also failed to serve pertinent discovery requests and take relevant depositions.   Defendants did not, however, join Plaintiff's request for a continuance.   In addition to prejudicing Defendants, granting Plaintiff's request on the literal eve of trial and following jury selection would have imposed significant costs and hardships on the judicial system and the citizenry at large.   A continuance was not appropriate.

## IV.  Conclusion

For the foregoing reasons, the motion for a new trial or relief from judgment filed by Plaintiff Melissa Dent will be denied.   A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

termination of proceedings." (ECF No. 57 n.2 (quoting *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 953 (4th Cir. 1987))).  To imply, as Plaintiff does, that this failsafe requires the court to overturn the jury verdict here turns causation on its head.